T.C. Memo. 2004-106

UNITED STATES TAX COURT

JERRY B. AND DONNA E. CLAWSON, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 18716-02L.          Filed April 23, 2004.

<u>Mitchell I. Horowitz</u>, for petitioners.

<u>Michael Pesavento</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COHEN, <u>Judge</u>:  This proceeding was commenced in response to
a Notice of Determination Concerning Collection Action Under
Section 6330 (notice of determination).  The notice of
determination sustained a proposed levy with respect to
petitioners' unpaid income tax liabilities for 1999 and 2000.
The issue for decision is whether the Appeals officer abused his

discretion by sustaining a proposed levy to collect petitioners' unpaid income tax liabilities for 1999 and 2000.

Unless otherwise indicated, all section references are to the Internal Revenue Code as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure. All amounts have been rounded to the nearest dollar.

## FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulated facts are incorporated in our findings by this reference. At the time that the petition in this case was filed, petitioners resided in Cape Coral, Florida.

### Background

Petitioners filed their joint Federal income tax return for 1999 on or about October 15, 2000, and their joint Federal income tax return for 2000 in October 2001 showing balances due. As of July 17, 2002, petitioners' unpaid income tax liabilities for 1999 and 2000, including accruals of interest and penalties, exceeded $385,000 and $64,000, respectively.

In March 2001, petitioners retained a certified public accountant, David B. McKinnon (McKinnon), to represent them before the Internal Revenue Service (IRS) in connection with the collection of their tax liabilities. On or about March 28, 2001, petitioners filed a Form 2848, Power of Attorney and Declaration

of Representative, designating McKinnon, Rance D. Hall, and R. Glenn Kirk, C.P.A., as their representatives.

On May 9, 2001, petitioner Jerry B. Clawson (Clawson), by signed stipulation and consent, agreed to the entry of an Order of Permanent Injunction and Other Relief As To Jerold Benjamin Clawson (order of permanent injunction) by the U.S. District Court for the Northern District of Georgia in an action brought against him by the Securities and Exchange Commission (SEC). The order of permanent injunction restrained and enjoined Clawson from further violations of various securities laws. The order of permanent injunction also required Clawson to pay disgorgement in the amount of $2,700,000, which represented Clawson's gains from the conduct that had been alleged in the complaint brought against him by the SEC. Payment of disgorgement in excess of $558,000 and prejudgment interest thereon was waived, however, based upon representations made by Clawson to the SEC in January 2001 as to his financial condition. The entire balance of the $558,000 disgorgement debt was to be paid by Clawson within 2 years of the entry of the order of permanent injunction (i.e., by May 9, 2003).

The order of permanent injunction also included a section entitled "Modification of the Freeze" that provided as follows:

> IT IS FURTHER ORDERED that the freeze on Clawson's
> assets, which was earlier imposed by order of this
> Court, shall be modified as follows:  Clawson is
> allowed to liquidate non-cash assets provided notice

prior to the liquidation of the assets is given to the Commission [SEC] staff, and the Commission [SEC] is given an opportunity to object [to] such liquidation, and that the proceeds from the liquidation of any such assets remain subject to the freeze. Clawson shall be allowed to borrow against his Florida homestead. The freeze shall also be modified to allow the Hatteras boat owned by Clawson to be placed in a charter fleet, for the purpose of generating income for Clawson to pay his disgorgement, or to otherwise preserve assets. The freeze shall be completely lifted as to Clawson at the time that his disgorgement obligation is retired, provided he is in compliance with all other orders of the Court.

## Review by Revenue Officer Riley

On or about July 30, 2001, Revenue Officer Vicki Riley (Riley) was assigned to collect petitioners' unpaid income tax liability for 1999. On August 7, 2001, Riley contacted petitioners by mail and by telephone to schedule an appointment for the purpose of obtaining financial information from them. Riley requested that petitioners complete a Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals (individual CIS).

On August 24, 2001, petitioners signed an individual CIS and submitted it to Riley. On their individual CIS, petitioners disclosed assets and equity, in pertinent part, as follows:

| Asset | Current Value | Encumbrance | Net Value |
| --- | --- | --- | --- |
| First Union Bank checking acct. | $3,000 | None | $3,000 |
| First Union Bank checking acct. | 2,000 | None | 2,000 |
| Fidelity Investments acct. | 27,000 | None | 27,000 |
| Investment (Sanibel-Captiva Airport Shuttle, Inc.) | 200,000 | $180,000 | 20,000 |
| Anticipated increase in income | 500,000 | None | 500,000 |
| 1999 Chevrolet Suburban | 30,000 | 25,000 | 5,000 |
| 1996 BMW 328 | 25,000 | None | 25,000 |

| | | | |
|---|---|---|---|
| 46-foot Trojan yacht | 100,000 | 71,000 | 29,000 |
| 61-foot Hatteras yacht | 600,000 | 410,000 | 190,000 |
| 30-foot Fountain yacht | 55,000 | 33,000 | 22,000 |
| Real estate | 1,450,000 | 1,150,000 | 300,000 |
| Real estate | 330,000 | 250,000 | 80,000 |
| Real estate | 7,000 | None | 7,000 |
| Furniture/personal effects | 25,000 | None | 25,000 |
| Business assets--Equipment | 2,000 | None | 2,000 |
| Accounts/notes receivable | 2,850/mo. | None | 2,850/mo. |

The instructions for the individual CIS directed petitioners to indicate the current value of their assets, i.e., the amount for which they could sell their assets as of that date.

The real estate valued at $1,450,000 on petitioners' individual CIS is their residence in Cape Coral, Florida (Cape Coral property). Petitioners acquired the Cape Coral property in November 1999 for $675,000. According to their individual CIS, petitioners had an outstanding mortgage balance of $1,150,000 on the Cape Coral property and a monthly mortgage payment of $9,384 as of August 24, 2001. On August 19, 2001, 5 days prior to submitting their individual CIS to Riley, petitioners listed the Cape Coral property for sale with Arvida Realty Services (Arvida) at a price of $2,700,000.

In addition to submitting their individual CIS to Riley on August 24, 2001, petitioners submitted the order of permanent injunction and four Forms 433-B, Collection Information Statement for Businesses. The Forms 433-B described business entities controlled and/or operated by petitioners.

On September 19, 2001, McKinnon proposed an installment agreement to Riley in which petitioners would pay $1,000 per

month for 18 months, with the remaining amount of their income tax liability to be paid at the end of the 18-month period. At the time that petitioners proposed this installment agreement to Riley, Riley had determined that the total amount of their unpaid tax liabilities was $645,537. This figure included the reported but unpaid income tax liability on petitioners' joint Federal income tax return for 1999 and trust fund penalties that had been imposed against each of them for 1991. Based upon the financial information petitioners submitted to Riley, she determined that petitioners had the ability to pay the total amount of their unpaid tax liabilities sooner than the amount of time requested in the proposed installment agreement. Accordingly, Riley rejected petitioners' proposed installment agreement.

On September 19, 2001, petitioners also submitted a Form 9423, Collection Appeal Request, in which they requested that respondent not file a Federal tax lien. Petitioners provided, in pertinent part, the following explanation for their request:

> Taxpayer is working to sell the assets reported on Forms 433-A and 433-B * * *. Taxpayer believes that a substantial portion of such assets can be sold by December 31, 2001 and that all can be disposed of within the next twelve months. These sales would provide funds to satisfy the tax liability in question. Filing a tax lien would materially reduce the market value of the assets to be sold and cause the banks to call loans on which most of these assets are pledged. That would put the taxpayer out of business with no resources to pay the tax liability.

We respectfully request that taxpayer be allowed a reasonable time to sell these assets in order to generate the funds necessary to satisfy this tax obligation.

On September 20, 2001, Riley informed McKinnon that petitioners' proposed installment agreement had been forwarded to an independent reviewer. Riley suggested to McKinnon that petitioners commence good faith payments of $1,000 per month in the event that the independent reviewer approved the proposed installment agreement. On September 21, 2001, the independent reviewer concurred in Riley's decision to reject petitioners' proposed installment agreement.

On October 4, 2001, Riley received a letter in response to a request that she had made to the IRS Office of Chief Counsel for an opinion with respect to the issue of whether the judgment rendered in favor of the SEC against Clawson (i.e., the $558,000 disgorgement debt) would have priority over the IRS if the IRS chose not to file a notice of Federal tax lien in its efforts to collect petitioners' unpaid income tax liability for 1999. That letter, in pertinent part, provided the following explanation to Riley:

> In the present case, if the SEC has taken the steps necessary to perfect its lien against whatever property the Service might wish to look to for collection, it will have priority since the government has not yet filed a notice of federal tax lien. If the SEC has not yet taken such steps, but does so in the future before a notice of federal tax lien is filed, it similarly will enjoy priority. The only way that the government can ensure that it will prevail with respect

to the taxpayer's property is if the SEC has taken no steps to perfect its judgment and the Internal Revenue Service chooses to file a notice of federal tax lien.

On October 23, 2001, Riley received a payment from petitioners in the amount of $1,000. Petitioners designated this payment to be applied against their income tax liability for 2000, and Riley applied it against that liability.

On December 19, 2001, Riley received a $2,000 payment from petitioners. This payment was applied to petitioners' income tax liability for 1999.

Petitioners obtained the SEC's permission to sell their 61-foot Hatteras yacht for $550,000 in December 2001. Petitioners used the proceeds of this sale to pay off the debt that encumbered the yacht (which was listed on their individual CIS as $410,000) and to pay for their living expenses. None of the proceeds of this sale were used towards the payment of petitioners' income tax liabilities for 1999 or 2000.

On February 4, 2002, Riley received two separate payments of $1,000 each from petitioners. Both payments were applied to petitioners' income tax liability for 1999.

On March 19, 2002, Riley received a $2,000 payment from petitioners. This payment was applied to petitioners' income tax liability for 1999.

On or about April 4, 2002, Riley faxed a message to McKinnon seeking an explanation of how the filing of a Federal tax lien

would destroy petitioners' ability to pay their tax liabilities and how petitioners would be able to pay those liabilities in full in 18 months.  On or about April 6, 2002, McKinnon faxed a response to Riley.  McKinnon's response stated, in pertinent part:

> If a tax lien is filed, taxpayer's lenders will call the notes on which taxpayer's assets are pledged. This would put the taxpayer out of business with no resources to pay the IRS.
>
> Taxpayer believes that he will be able to sell the encumbered assets within the next 18 months and clear enough to pay the IRS in full.

On July 17, 2002, Riley issued a Final Notice-Notice of Intent to Levy and Notice of Your Right To a Hearing (final notice) to each petitioner for their unpaid income tax liabilities for 1999 and 2000.  Clawson's final notice included the unpaid amount of the trust fund penalty that had been imposed against him for 1991.  Riley sent a copy of the final notice to McKinnon along with a letter that provided the following explanation:

> We are taking this action because the taxpayer has not made Estimated Tax payments for 2000, 2001, nor 2002. He has only paid seven of ten promised payments toward the liability as you had suggested in September of 2001.  According to the 2000 Income Tax return, he has increased his liability substantially via a capital gain that was not used to pay his tax obligation.

On July 31, 2002, the IRS Office of Appeals denied petitioners' Collection Appeal Request of September 19, 2001.

Proceedings Before Appeals Officer Luhmann

On August 6, 2002, petitioners timely filed a Form 12153, Request for a Collection Due Process Hearing, in which they objected to both the proposed levy action and the filing of a Federal tax lien with respect to their unpaid income tax liabilities for 1999 and 2000.  At the time that petitioners filed Form 12153, no Federal tax lien had been filed against them.  In the Form 12153, McKinnon disclosed that petitioners were continuing their efforts to sell the Cape Coral property.

> Taxpayers are in the process of selling their personal residence.  * * *

> Anticipated proceeds, after satisfaction of existing mortgages, should be sufficient to pay the amount owed the IRS.

McKinnon attached to the Form 12153 a copy of the listing agreement that petitioners had entered into with Arvida for the sale of the Cape Coral property.  Appeals Officer Monty Luhmann (Luhmann), respondent's settlement officer in the St. Paul, Minnesota, Appeals Office, received petitioners' request for a hearing on or about August 27, 2002.

On September 27, 2002, Luhmann sent a letter to petitioners offering a telephonic hearing or, in the alternative, to transfer their case to Florida for a face-to-face meeting.  This letter also set forth the following information:

> When we meet to discuss your case, our meeting will be informal and you may present facts, arguments, and legal authority to support your position.  We will

> discuss the law and how it applies to the facts in your case.  The primary purpose of this hearing is to verify all legal and procedural requirements were followed in proposing the collection action for the periods listed above.  Additionally, the consideration of less intrusive collection alternatives will be a focus of this hearing.  Please be prepared to discuss any alternative that you wish for me to consider in an effort to resolve your case.

In addition, Luhmann advised petitioners that they were not entitled to a hearing on the filing of a Federal tax lien because no such lien had been filed.

By letter dated October 2, 2002, petitioners elected to hold a telephonic hearing, which was subsequently held on October 21, 2002, between Luhmann and McKinnon.

On October 25, 2002, respondent filed a Notice of Federal Tax Lien against petitioners for their unpaid income tax liabilities for 1999 and 2000 in the public records of Lee County, Florida.  Petitioners were notified of the filing of the Federal tax lien as required under section 6320, but they did not request that a hearing be held with respect to the filing of that lien.

On October 30, 2002, Luhmann issued a notice of determination to each petitioner in which he sustained the proposed levy to collect petitioners' unpaid income tax liabilities for 1999 and 2000.  Luhmann also issued a separate notice of determination to Clawson in which he sustained the proposed levy to collect the unpaid portion of the trust fund

penalty that had been imposed against him for 1991 (a matter not before us or within our jurisdiction). Luhmann provided, in pertinent part, the following explanation for sustaining the proposed levy:

> The Revenue Officer advised you of pending enforcement action on 08/15/01. After you failed to sell your house to satisfy this liability, the Revenue Officer proceeded to issue the Notice of Intent to Levy. LT1058 Notice of Intent to Levy was issued by certified mail to your last known address. The Revenue Officer had a levy source and levy was the next anticipated action. The Revenue Officer followed the legal and administrative requirements necessary for issuing a Notice of Intent to Levy.

>     *    *    *    *    *    *    *

> Issues raised by the taxpayer:

> On an attachment to Form 12153, you raised the issue of selling your house as an alternative to collection action. Your power of attorney raised this issue during your hearing on 10/21/02 and requested more time to sell your second home, valued at $2.9 million. A copy of the listing agreement shows that this property has been on the market since September of 2001. I recognize that it takes longer to sell a home valued at $2.9 million than it would to sell a home priced at the median value in your market. Even so, thirteen months should have been sufficient to either sell or borrow against the property. Your power of attorney advised me during your hearing that you borrowed against the property to meet your expenses in the last year.

>     *    *    *    *    *    *    *    *

> Balancing the need for efficient collection with the taxpayer concern that the collection action be no more intrusive than necessary:

> Revenue Officer Vicki Riley has been working with you since August of 2001 to see that this liability is paid. I can find no compelling reason to further delay the collection of this account. There is sufficient

equity in your second home to pay this liability in full either through the sale of the property or through a cash-out loan against the property. To delay collection further would risk the collection of this liability.

Perhaps you should consider lowering your asking price or consulting with your real estate agent to see what you can do to expedite a voluntary sale of the property. If you are unable or unwilling to borrow against or sell the property to satisfy the IRS, then the IRS has no choice but to proceed to collect this account through levy action.

Petitioners timely petitioned the Court under section 6330(d) from their notices of determination for the unpaid income tax liabilities for 1999 and 2000.

OPINION

Section 6331(a) provides that, if any person liable to pay any tax neglects or refuses to pay such tax within 10 days after notice and demand for payment, the Secretary is authorized to collect such tax by levy upon property belonging to the taxpayer. Section 6331(d) provides that the Secretary is obliged to provide the taxpayer with notice, including notice of the administrative appeals available to the taxpayer, before proceeding with collection by levy on the taxpayer's property. Section 6330 generally provides that respondent cannot proceed with the collection of taxes by way of a levy on a taxpayer's property until the taxpayer has been given notice of and the opportunity for an administrative review of the matter (in the form of an Appeals Office hearing) and, if dissatisfied, with judicial

review of the administrative determination.  Section 6330(c)(2)(A) specifies issues that the taxpayer may raise at the hearing.  The taxpayer is allowed to raise "any relevant issue relating to the unpaid tax or the proposed levy" including spousal defenses, challenges to the appropriateness of collection action, and alternatives to collection.  Sec. 6330(c)(2)(A).  Section 6330(c)(3) provides that the determination of the Appeals officer shall take into consideration the verification under section 6330(c)(1), the issues raised by the taxpayer, and whether the proposed collection action balances the need for the efficient collection of taxes with the legitimate concern of the taxpayer that any collection action be no more intrusive than necessary.  Where, as here, liability for the underlying tax is not disputed, we review the Appeals officer's determination for abuse of discretion.  Goza v. Commissioner, 114 T.C. 176, 181-182 (2000).

At trial of this case in September 2003, petitioners offered into evidence a First Supplemental Stipulation of Facts (supplemental stipulation).  The supplemental stipulation referred to exhibits that were not before Luhmann at the time of petitioners' section 6330 hearing and were not a part of the administrative record in this case.  Respondent objected to the supplemental stipulation's being received into evidence on the grounds that the exhibits referred to therein were not a part of

the administrative record.  The exhibits referred to in the supplemental stipulation include petitioners' income tax returns for 1998 through 2001; two orders by the U.S. District Court for the Northern District of Georgia in the case of SEC v. Phoenix Telecom, LLC that are dated in August 2000; the opinion rendered in the case of SEC v. ETS Payphones, Inc., 300 F.3d 1281 (11th Cir. 2002); an order by the U.S. District Court for the Middle District of Florida in the case of William & Hazel Barclay v. Phoenix Telecom, LLC that is dated in October 2002; a listing agreement between petitioners and Century 21 Sunbelt Realty, Inc. for the sale of the Cape Coral property that is dated in September 2002; an appraisal of $2,900,000 for the Cape Coral property that is dated in October 2002; three different advertisements for the Cape Coral property that are dated between December 2002 and August 2003; and a marketing service report for the sale of the Cape Coral property that shows activity through August 1, 2003.  Respondent also objected to the testimony offered by Clawson at trial.  The Court noted respondent's objection but allowed testimony to proceed.

Respondent contends that we should not consider the supplemental stipulation, the trial testimony, or any other matters that were not presented to Luhmann because they are not a part of the administrative record in this case.  For the reasons

set forth below, we sustain Luhmann's determination whether or not we consider the additional evidence.

The sole issue raised by petitioners at their section 6330 hearing was an offer of a collection alternative. The collection alternative proposed by petitioners involved postponing the levy to allow petitioners to sell the Cape Coral property at some unspecified point in the future for its market value, approximately $2,700,000. (As of the time of trial in September 2003, the Cape Coral property had not been sold.)

Petitioners argue that Luhmann abused his discretion by rejecting their proposed collection alternative because he failed to take into consideration the impact of the events of September 11, 2001, on petitioners' ability to sell the Cape Coral property. Moreover, petitioners argue that Luhmann abused his discretion by sustaining the proposed levy because he (1) did not request updated financial information from petitioners in his letter of September 27, 2002; (2) did not give greater consideration to the impact of the order of permanent injunction on petitioners' ability to pay their income tax liabilities for 1999 and 2000; (3) did not include any notes from his telephonic meeting with McKinnon on October 21, 2002, in the administrative record; and (4) reached his decision to sustain the proposed levy in "barely one month" from the time that he contacted

petitioners.  As we discuss below, petitioners' arguments are not persuasive.

Clawson testified as to, inter alia, the "soft" real estate market since the Cape Coral property had been listed for sale in August 2001, petitioners' inability to borrow any further against the Cape Coral property, petitioners' business dealings between August 2001 and October 2002, and his understanding of the order of permanent injunction and the modified asset freeze contained therein.  Much of Clawson's testimony, on cross-examination, admitted dispositions of assets and increased borrowing against the Cape Coral property without application of any of the proceeds to petitioners' tax obligations.  This evidence, had it been presented to Luhmann, is not likely to have changed his determination and does not show an abuse of discretion.  See, e.g., Pless v. Commissioner, T.C. Memo. 2004-24.

There is no requirement that an Appeals officer take notes at a section 6330 hearing, and there is neither requirement nor reason that the Appeals officer wait a certain amount of time before rendering his determination as to a proposed levy.  See sec. 301.6330-1(d)(2), Q&A-D6, Proced. & Admin. Regs.; sec. 301.6330-1(e)(3), Q&A-E9, Proced. & Admin. Regs.  Moreover, Riley worked with petitioners for more than 1 year before their case was assigned to Luhmann.  Accordingly, we reject petitioners' argument that Luhmann abused his discretion on those grounds.

Based upon our review of the relevant evidence in this case, we conclude that Luhmann did not abuse his discretion by rejecting petitioners' proposed collection alternative. Consequently, we further conclude that Luhmann did not abuse his discretion by sustaining the proposed levy to collect petitioners' unpaid income tax liabilities for 1999 and 2000.

We have considered the arguments of the parties that were not specifically addressed in this opinion. Those arguments are either without merit or irrelevant to our decision.

To reflect the foregoing,

<u>Decision will be entered for respondent</u>.